NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 33

No. 25-AP-302

| | |
|---|---|
| Susan Inouye | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Estate of Patricia McHugo et al. | March Term, 2026 |
| (Gregory McHugo and Nancy Patricia McHugo, | |
| Appellants) | |

H. Dickson Corbett, J.

Kevin M. Henry and Angélina L. Debeaupuis of Primmer Piper Eggleston & Cramer, PC,
  Burlington, for Plaintiff-Appellee.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, for Defendants-Appellants.

PRESENT:  Reiber, C.J., Eaton, Waples, Nolan and Drescher, JJ.

¶ 1.    **NOLAN, J.**  This case arises from mutual wills executed by the parties' parents, John and Patricia McHugo. Defendants Gregory and Nancy McHugo appeal from the trial court's entry of judgment for their sister, plaintiff Susan McHugo Inouye, on her unjust-enrichment claims.[1] The court concluded that their parents' mutual wills formed a contract under which John

---

[1] On July 10, 2026, Susan filed a pleading representing that Gregory passed away in April 2026 and moving for the substitution of his estate as a party under Vermont Rule of Appellate Procedure 43(a)(1). Because Susan did not certify that she served this motion on Gregory's personal representative as required by the rule, the motion is denied. See V.R.A.P. 43(a)(1) (providing that, if party dies while appeal is pending in this Court, "the decedent's personal representative may be substituted as a party on motion" and requiring that motion "be served on

and Patricia agreed that all property owned by the surviving parent at his or her death—including property they formerly held in joint tenancy with rights of survivorship—would be divided equally among their three children.[2] It determined that Patricia, who survived John, breached this contract by revoking her will, transferring two residential properties to Gregory and Nancy before her death, and entirely disinheriting Susan. The court held that Patricia's actions unjustly enriched defendants and that Susan was entitled to money-judgment and constructive-trust remedies. On appeal, defendants argue that the judgment should be vacated because the mutual wills did not require that Patricia's assets be divided equally among the three siblings at the time of her death. They also contend that even if the judgment stands, the court's award of prejudgment interest must be vacated. We affirm.

## I. Background

¶ 2. This background is drawn from the record and the unchallenged factual findings in the trial court order on appeal. John and Patricia were married and had three children: Gregory, Susan, and Nancy. Following their 1978 divorce, John and Patricia continued to share most of their financial assets. They held multiple savings and investment accounts in both of their names as joint tenants with rights of survivorship. In 1982, they purchased a home for John in Tucson, Arizona, and titled it in both of their names with rights of survivorship. They structured their assets in this manner because, in the event of his death, John wanted his property to be available to Patricia for her use during her lifetime and then, upon her death, inherited by their three children.

---

the representative"). Susan may, however, raise this issue in the civil division pursuant to Vermont Rule of Civil Procedure 25(a).

[2] Because this case involves multiple individuals with the same surname, we refer to each by their first name for purposes of ease and clarity. Unless otherwise specified, "defendants" refers to Gregory and Nancy and does not include Patricia's estate, which was a defendant in the proceeding below but did not participate in this appeal.

John saw joint tenancies as an estate-planning measure that would further his goal of avoiding both probate courts and estate taxes.

¶ 3.     In 1997, as part of John's estate planning, he and Patricia executed mutual wills in Arizona.  Each will stated that it was "executed in consideration of a mutual will simultaneously executed by" the other party and specified that "the parties have agreed not to revoke or alter these Wills except with the mutual consent of both."  The two wills mirrored one another in all material respects.

¶ 4.     As relevant here, Article III—titled "Bequest and Devise of Whole Estate and Residue"—set forth the testator's "intention by this Will to dispose of all of my property which I may own at the date of my death."  With certain limited exceptions not relevant here, each testator also stated, "I give, devise and bequeath the residue of my estate . . . in trust for the lifetime of [the other parent] in accordance with the terms and conditions following."

¶ 5.     Those terms and conditions called for the establishment and maintenance of a testamentary trust under which the surviving parent would receive payments of the net trust income and so much of the principal as necessary for their "health, maintenance and support" in their accustomed manner of living, "taking into consideration the principal and income" as well as other resources available to them.  A clause titled "Termination of Trust" provided:

> The trust created under this Will shall terminate upon the death of [the other parent].  Upon termination of the trust, any remaining residuary assets shall be divided equally among my children, Gregory John McHugo, Susan Kay McHugo Inouye and Nancy Patricia McHugo, or, in the event that any or all of my children shall have predeceased [the other parent], then in equal shares to their children, per stirpes.

See Per stirpes, Black's Law Dictionary (12th ed. 2024) ("Proportionally divided between beneficiaries according to their deceased ancestor's share.").  In addition to the trust-termination clause, both wills included a survival clause, which read:

3

The invalidity of any provision of this trust instrument shall not affect the validity of the remaining provisions.

In the event that [the other parent] does not survive me by thirty days, then I give, devise and bequeath all of my property, real and personal, and any residuary estate to be divided equally among my children, Gregory John McHugo, Susan Kay McHugo Inouye and Nancy Patric[i]a McHugo or, in the event that any or all of my children shall have predeceased me, then in equal shares to their children, per stirpes.

See Estate, Black's Law Dictionary (12th ed. 2024) (defining "residuary estate" as "[t]he part of a decedent's estate remaining after payment of all debts, expenses, statutory claims, taxes, and testamentary gifts (special, general, and demonstrative) have been made").

¶ 6. When the wills were executed, John and Patricia understood that all of their meaningful assets were jointly titled with rights of survivorship, and that these assets would therefore pass to the survivor by operation of law rather than through the probate court. By entering the mutual wills, John and Patricia intended to ensure that the surviving parent would bequeath the assets they formerly held as joint tenants to their three children upon his or her death.

¶ 7. In 2006, Patricia executed a new will in Montpelier, Vermont. The new will revoked Patricia's 1997 will. It left $5000 to each of Susan's three children, but otherwise expressly disinherited Susan, directing instead that Patricia's estate be divided between Gregory and Nancy.

¶ 8. John passed away in 2010. At the time of his death, all of the jointly titled assets passed to Patricia by operation of law. As it turned out, there was no residuary estate, and therefore no need to open a probate proceeding or create a lifetime testamentary trust for Patricia as contemplated by the terms of both wills upon the first parent's death.

¶ 9. After John's death, Patricia made two property transfers that benefited Gregory and Nancy to Susan's detriment. Patricia deeded the Tucson home to Gregory and Nancy, effective upon her death. She also deeded a cottage in Greensboro, Vermont—which she purchased before

4

John's death, with his consent, and using their jointly owned funds—to Gregory and Nancy.[3] In addition, Patricia made numerous gifts to members of Gregory and Nancy's respective families.

¶ 10. Patricia died in 2016, six years after John. Her estate was opened in a Vermont probate court, and its special administrator filed a motion to allow her 2006 will. Susan, in turn, moved to allow Patricia's 1997 will and to disallow her 2006 will, arguing that her parents' mutual wills invalidated the latter. The probate division granted the motion to allow the 2006 will and denied the motion to allow the 1997 will.

¶ 11. Susan appealed to this Court, and we affirmed. In re Est. of McHugo (McHugo I), 2020 VT 59, ¶ 1, 212 Vt. 519, 237 A.3d 1239. In McHugo I, we explained that a proceeding to allow a will does not encompass other claims against the testator's estate, but instead "addresses only a very specific set of issues related to whether the instrument is or is not the will of the testator and whether it is otherwise valid." Id. ¶ 10 (quotation omitted). We held that Patricia's 2006 will was valid and that it revoked her 1997 will. Id. ¶ 9. We noted, however, that while Susan's contentions regarding the 1997 mutual wills did not support an order invalidating Patricia's 2006 will, Susan was "not left without a potential remedy" because her filings did "reflect a claim against the estate." Id. ¶¶ 9, 13.

¶ 12. In 2021, Susan filed this civil suit against Patricia's estate and her two siblings. Susan asserted claims of breach of contract and breach of the covenant of good faith and fair dealing against the estate; intentional interference with expected inheritance and unjust enrichment against all three defendants; and intentional interference with performance of contract and constructive trust against Gregory and Nancy.

---

[3] Although the court did not make express findings on this point, the evidence at trial indicates that Patricia purchased this cottage in 2007—with John's written consent and using $250,000 in funds drawn from one of their joint accounts—before transferring it to Gregory and Nancy in 2014.

¶ 13.   After discovery, Gregory and Nancy moved for summary judgment on all of Susan's claims against them.  The court granted the motion in part and denied it in part.  It entered judgment for Gregory and Nancy on the intentional-interference counts, explaining that there was no evidence that either of them induced Patricia to disinherit Susan through independently tortious conduct as necessary to support those claims.   The court held, however, that Susan's interconnected unjust-enrichment and constructive-trust claims—predicated on the theory that Patricia's wrongful conduct deprived Susan of an inheritance now in the possession of Gregory and Nancy—could be maintained based on the facts alleged and therefore had to be tried.[4]

¶ 14.   The court held a bench trial over two days in March 2024.  Remaining for trial along with the unjust-enrichment and related constructive-trust claims against Gregory, Nancy, and the estate, were Susan's claims against the estate of breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with expected inheritance. After the close of evidence, the court issued a written decision concluding that the 1997 contract for mutual wills between John and Patricia never became enforceable—either because John had notice of Patricia's intention to disinherit Susan prior to his death and did not act, or, in the alternative, because he consented to it.  As a result, it entered judgment for Gregory, Nancy, and the estate on all remaining claims.

¶ 15.   Susan appealed to this Court, and we reversed and remanded for further proceedings.  Inouye v. Est. of McHugo (McHugo II), 2024 VT 75, ¶ 1, 220 Vt. 271, 328 A.3d 1229.  We explained that the mutual wills comprised a contract between John and Patricia,

---

[4] As the trial court explained, although Susan pleaded unjust enrichment and constructive trust as separate claims, the two theories are necessarily addressed together because Susan sought the establishment of constructive trust as a remedy for unjust enrichment.  See, e.g., Shattuck v. Peck, 2013 VT 1, ¶ 11, 193 Vt. 123, 70 A.3d 922 (explaining that courts may employ equitable remedy of constructive trust "to prevent unjust enrichment" in circumstances where "a party obtains some benefit that they cannot, in good conscience, retain" (quotation omitted)); Legault v. Legault, 142 Vt. 525, 529, 459 A.2d 980, 983 (1983) (recognizing constructive trust as "a tool often used by courts to prevent unjust enrichment" (quotation omitted)).

"enforceable on its own terms," under which each promised to devise their property as prescribed in the wills. Id. ¶¶ 12-13. Applying fundamental contract-law principles, we concluded that unilateral notice was insufficient to rescind the contract. Id. ¶ 15. We further held that the trial court's findings inadequately supported its alternative conclusion regarding John's consent because they reflected only that John did not object to Patricia's repudiation of the contract. Id. ¶¶ 22-23.

¶ 16. On remand, the parties agreed that the civil division would issue new findings of fact and conclusions of law based on the evidentiary record created at the March 2024 bench trial. After considering the parties' supplemental filings, the court issued a written order. It rejected defendants' argument that the mutual wills governed the disposition of only those assets that passed from the first-deceased parent to the surviving parent through the testamentary-trust provision—of which there were none. The court explained that to accept defendants' proposed interpretation—that their parents did not intend these instruments "to control the disposition of 'all' the surviving [parent]'s property" but only to control any assets that passed through testamentary trust—was tantamount to holding that the parties intended the mutual wills to "have little or no effect." It held that the contract reflected an express agreement that all of the property owned by the surviving parent at the time of his or her death—without limitation as to how it had been acquired—would be distributed equally among their three children. It also rejected defendants' argument that a provision of the wills authorizing the personal representative of the first-deceased parent to allocate "disproportionate shares of assets among the distributees" vested the surviving parent with "freewheeling distributive authority," explaining that this interpretation would be unreasonable and contrary to the express distributive provisions in the wills. Based on these conclusions, the court held that Patricia breached the mutual-wills contract in two ways.[5]

---

[5] In her post-remand filings, Susan did not request that the trial court enter judgment against Patricia's estate on her pending intentional-interference-with-expected-inheritance and

7

¶ 17.   First, it determined that Patricia breached the survival clause by leaving $1,951,155 in certain specified financial assets in accounts she held at the time of her death to Gregory and Nancy, and that defendants were unjustly enriched by receiving the portion of these assets that Susan should have inherited.  It held that Susan was entitled to a money judgment of $650,385, which represented one-third of the value of those assets.  Second, the court concluded that Patricia violated the covenant of good faith and fair dealing implied in the mutual-wills contract by transferring the Greensboro cottage and Tucson home to Gregory and Nancy before her death.  The court reasoned that these transfers contravened the agreed common purpose of Patricia's contract with John and the justified expectation that the properties would be inherited by all three children in equal shares.  The court again concluded that Gregory and Nancy had been unjustly enriched because of the breach and imposed a remedy in the form of a constructive trust over one-third of the interest in each property.  See Trust, Black's Law Dictionary (12th ed. 2024) (defining "constructive trust" as "[a]n equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it" and therefore gives claimant "a right to the property rather than a claim for damages").

¶ 18.   Finally, the court considered whether Susan was entitled to an award of prejudgment interest.  It declined to make that award on the real properties because their value was not presently liquidated and because the constructive-trust remedy sufficed to capture any appreciation in their value between the date of the breach and the entry of final judgment.  It concluded, however, that prejudgment interest was mandatory as to the monetary portion of the award, running from November 2016 until the entry of final judgment in April 2025.[6]  The court

_____

unjust-enrichment claims.  The trial court, in turn, did not address these claims in its written decision or subsequent final judgment order.  We do not discuss them further in this opinion because they are irrelevant to the issues before us on appeal.

[6] Patricia died in May 2016.  The court explained that the evidence at trial established the financial value of the assets at issue as of October 2016, which was "reasonably contemporaneous

8

calculated the amount of prejudgment interest on that award at $663,285.79—resulting in a total monetary award of $1,313,670.79—and entered final judgment.

¶ 19. Gregory and Nancy moved to amend the final judgment, arguing that the court erred in concluding that an award of prejudgment interest was mandatory and that the circumstances did not support a discretionary award. The court denied the motion. It reaffirmed its conclusion that prejudgment interest was mandatory under the circumstances of the case, but explained that even if it were not, it would award prejudgment interest in its discretionary capacity. This third appeal followed.

## II. Analysis

¶ 20. Defendants' arguments on appeal fall into two categories. Gregory and Nancy principally challenge the trial court's entry of judgment against them on Susan's unjust-enrichment claims, contending—for several reasons—that it erred in concluding that Patricia breached the mutual-wills contract. Defendants also assert that, even if we affirm the judgment, we should reverse the court's award of prejudgment interest.

¶ 21. In appeals from a judgment entered following a bench trial, we recognize that "[i]t is the province of the trial court to determine the credibility of witnesses and weigh the persuasive effect of the evidence," and we defer to its determinations on these points. Bruntaeger v. Zeller, 147 Vt. 247, 252, 515 A.2d 123, 126 (1986); see Lofts Essex, LLC v. Strategis Floor & Décor Inc., 2019 VT 82, ¶ 17, 211 Vt. 204, 224 A.3d 116 (explaining that we "defer to" trial court's determinations on credibility and weight of evidence). We will not disturb the court's factual findings unless they are clearly erroneous. Hirchak v. Hirchak, 2024 VT 81, ¶ 15, 220 Vt. 432, 331 A.3d 1051 (recognizing that finding is clearly erroneous only where there is no credible

---

with the date of the breach." It thus awarded prejudgment interest on the monetary award—which represented one-third of the value of those assets—from November 1, 2016, until the date of the final judgment.

9

evidence to support it). We take up pure questions of law without deference to the decision below. Id. Where the court has applied the correct legal standard, however, "we will uphold its conclusions of law if reasonably supported by its findings." Id. (quotation omitted).

## A. Unjust Enrichment

¶ 22. We first consider defendants' argument that the court erred in concluding that Patricia's actions breached the mutual-wills contract and that they were unjustly enriched as a result. Defendants contend that the survival clause applied only if John outlived Patricia but then passed away within thirty days of her death, and that the mutual wills otherwise imposed no limitations on the disposition of assets that did not pass between parents through testamentary trust. As a result, defendants assert, the mutual wills made no provision for the ultimate distribution of the assets John and Patricia formerly held as joint tenants, such as bank accounts and real property. Alternatively, defendants argue that even if the wills governed that property, they were not unjustly enriched because John's will granted Patricia authority, in her role as his personal representative, to make unequal distributions among their children. Finally, they contend that the mutual wills did not specifically prohibit Patricia from transferring assets not held in trust—such as the Greensboro and Tucson properties—to them before her death even if they precluded such transfers after her passing.

¶ 23. "Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable." Kellogg v. Shushereba, 2013 VT 76, ¶ 22, 194 Vt. 446, 82 A.3d 1121 (quotation and alteration omitted). To prevail on an unjust-enrichment claim, a plaintiff must prove that: "(1) a benefit was conferred on [the] defendant; (2) [the] defendant accepted the benefit; and (3) [the] defendant retained the benefit under such circumstances that it would be inequitable for [the] defendant not to compensate [the] plaintiff for its value." Beldock v. VWSD, LLC, 2023 VT 35, ¶ 68, 218 Vt. 144, 307 A.3d 209 (quotation omitted). "Whether a party has been unjustly enriched is a question of fact; however, whether a claim for unjust

10

enrichment can be maintained, given certain facts, is a legal question reviewed de novo." Id. "When a party can maintain a claim for unjust enrichment, 'we give deference to the trial court's decision to grant or withhold equitable remedies' and accordingly review the trial court's decision for an abuse of discretion." Id. (quoting McLaren v. Gabel, 2020 VT 8, ¶ 21, 211 Vt. 591, 229 A.3d 422).

¶ 24.    Defendants do not dispute that the mutual wills are testamentary instruments and that they form an enforceable contract between John and Patricia in which they exchanged reciprocal promises to make the prescribed testamentary dispositions. McHugo I, 2020 VT 59, ¶ 11 (" 'A single instrument may be both a will contractual in nature, and a contract testamentary in nature; as a will it is revocable but as a contract it is enforceable.' " (quoting Garrett v. Read, 102 P.3d 436, 444-45 (Kan. 2004), disapproved on other grounds by Nelson v. Nelson, 205 P.3d 715, 272 (Kan. 2009)); McHugo II, 2024 VT 75, ¶ 12 (explaining that trial court's findings established that "John and Patricia enacted a valid contract for mutual wills" and concluding the contract was "enforceable on its own terms"). Nor do they contest that an unjust-enrichment claim may lie "in a case where property or funds have been diverted to a third person in violation of the terms of a contract to make a specific devise." Mueller v. Mueller, 2012 VT 59, ¶ 29, 192 Vt. 85, 54 A.3d 168. The sole issue before us is whether the trial court erred in concluding that Patricia violated the terms of the mutual-wills contract. If, as Gregory and Nancy argue, Patricia had no contractual obligation to leave her estate to her three children in equal shares, then no "benefit" was conferred on either of them as required to sustain Susan's unjust-enrichment claims. Beldock, 2023 VT 35, ¶ 68; see In re Est. of Elliot, 149 Vt. 248, 253 n.2, 542 A.2d 282, 286 n.2 (1988) (explaining that, for purpose of measuring damages, "[u]njust enrichment focuses on the value of the benefit actually conferred upon the defendant").

¶ 25.    Whether Patricia breached the express terms of the contract is a question of law that we review de novo. Avery v. Est. of Avery, 2018 VT 59, ¶ 5, 207 Vt. 570, 192 A.3d 1250

11

(explaining that both construction of will and interpretation of parties' agreements are questions of law subject to de novo review); Beldock, 2023 VT 35, ¶ 27 ("Whether a set of facts constitutes a breach of contract is a question of law."). We "treat a contract to make a will in the same way as any other contract" under Vermont law.[7] McHugo II, 2024 VT 75, ¶ 12. "The cardinal principle in the construction of any contract is to give effect to the true intention of the parties." In re Cronan, 151 Vt. 576, 579, 563 A.2d 1316, 1317 (1989). To accomplish this end, we look first to the language they used, considering the plain meaning of individual terms in the context of the agreement as a whole. Sutton v. Purzycki, 2022 VT 56, ¶ 37, 217 Vt. 326, 295 A.3d 377. "If the plain language is clear, 'we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract.' " Id. (quoting Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298)). Where the contract is unambiguous, we must declare the interpretation as a matter of law; only if the contract is ambiguous does its interpretation become a question of fact. Id. ¶ 38.

¶ 26.     Of course, because this contract represents John and Patricia's agreement to dispose of their estates in the manner described in their mutual wills, we must also interpret each will as a testamentary instrument. Though this adds another layer to the inquiry, the relevant legal framework dovetails with that applied in our contract analysis, and our lodestar remains the same: "[i]n construing a will, our objective is to discern the intent of the testator." Avery, 2018 VT 59, ¶ 6. As with contracts, we look first to " 'the language used, since, so far as it may be legally carried out, that governs.' " Id. (quoting In re Est. of Barslow, 128 Vt. 192, 196, 260 A.2d 374, 377 (1969)). In doing so, we take " 'the instrument by its four corners, consider it in all its parts,

    [7] Although the 1997 wills were executed in Arizona, we interpret them under Vermont law because no party alleges an actual conflict of law. McHugo II, 2024 VT 75, ¶¶ 6-7 (explaining that Vermont evaluates choice-of-law issues under analysis set forth in Restatement (Second) of Conflict of Laws, which applies only where proponent of foreign state's law first demonstrates actual conflict between Vermont law and foreign state's law).

and give effect to its language read in the light of the relation of the parties concerned and the circumstances attending its execution.' " In re Est. of Holbrook, 2016 VT 13, ¶ 29, 201 Vt. 254, 140 A.3d 788 (quoting In re Est. of Mattison, 122 Vt. 486, 488, 177 A.2d 230, 231 (1962)); see Ripley v. Benjamin, 111 Vt. 76, 79, 10 A.2d 205, 206 (1940) ("Consideration must be given to every part of a will, since it is not to be presumed that the testator used an unnecessary word or one to which no proper force can be given."). Only if we conclude, on this basis, that the provisions of a will are ambiguous may we rely on canons of construction to discern the meaning of disputed terms or "consider extrinsic evidence in order to clarify the circumstances surrounding the making of the agreement." Holbrook, 2016 VT 13, ¶ 29. In the absence of an ambiguity, we enforce the will as written, and do not resort to extrinsic evidence or canons "in an attempt to unravel what needs no unraveling." Mattison, 122 Vt. at 488, 177 A.2d at 231 (explaining that in absence of ambiguity, "we are not bound by what [the testator] meant to say in her will, but what she meant by what she did say").

¶ 27. Like a contractual provision, a testamentary provision is ambiguous "only to the extent that reasonable people could differ as to its interpretation," and the mere "fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577, 581, 556 A.2d 81, 83, 85 (1988); see Holbrook, 2016 VT 13, ¶ 29 (citing Isbrandtsen, 150 Vt. at 578-79, 556 A.2d at 83-84, for principles of contract construction applicable to wills). Rather, if a will or contract, though "inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." Isbrandtsen, 150 Vt. at 580-81, 556 A.2d at 85 (quotation omitted).

¶ 28. Here, the parties agree that the trust-termination provision—which called for the establishment of a testamentary trust upon the death of the first parent to be divided equally among the three children after the death of the second—never went into effect. See supra, ¶ 5. Instead, upon John's death in 2010, all of his meaningful assets were held in joint tenancy with Patricia

13

and therefore passed to her through the right of survivorship. As a result, John's will was never probated, and no lifetime testamentary trust was established for Patricia.

¶ 29. Contrary to defendants' position, it does not follow from there that assets Patricia received from John through right of survivorship and outside a testamentary trust—essentially all of the real estate and financial accounts at issue in this case—were insulated from equal distribution among the three children upon the surviving parent's death. To the contrary, the survival clause in Patricia's 1997 will provided: "In the event that John Walter McHugo does not survive me by thirty days, then I give, devise and bequeath all of my property, real and personal, and any residuary estate to be divided equally among my children." Giving these words their ordinary meaning would have demanded the equal three-part distribution amongst the children of all assets Patricia owned at the time of her death. Put differently, a plain reading of the survival clause compels affirmance of the trial court's conclusion that Patricia breached the mutual-wills contract.

¶ 30. Defendants nevertheless insist that the survival clause became operative only if a particular sequence of events occurred first. Specifically, in defendants' view, this provision took effect only if John first outlived Patricia and then died in the thirty-day period following her death. They ground this interpretation in Black's Law Dictionary, which defines "survival clause" as "[a] testamentary provision conditioning a bequest on a beneficiary's living for a specified period, often 60 days, after the testator's death" and provides that "[i]f the beneficiary dies within the stated period, the testamentary gift usu[ally] accrues to the residuary estate." Survival clause, Black's Law Dictionary (12th ed. 2024).

¶ 31. Defendants' reliance on a generic definition, while understandable, is misplaced, because our objective is to discern and effectuate the intent of John and Patricia as reflected in their mutual wills by honoring—insofar as they are unambiguous—the common meaning of the words they chose. This exercise reveals that the clause does indeed contain a precondition, just

14

not the one defendants have identified. Rather, it is the establishment of a testamentary trust under Patricia's will—not the three-way distribution of all her property and any residual estate—that is conditioned on John surviving Patricia by at least thirty days. In the event that did not happen, and thus no trust was created, her will still clearly directed the disposition of all of Patricia's property, without regard for whether she came into it because John died before her or because he died within the thirty-day period following her death. We discern no support in a natural reading of this will's survival clause for defendants' version of the necessary contingency.

¶ 32. John died approximately six years before Patricia; therefore, he "d[id] not survive [her] by thirty days" and her property was to be divided equally among their three children. See In re Peck's Est., 101 Vt. 502, 508, 144 A. 686, 688 (1929) (concluding that language of clause in will was "too clear and explicit to admit of serious doubt as to its meaning" and therefore enforcing it as written). The "plain and natural meaning" of the words of the survival clause admit of no other reading and we may not contravene the words the parties chose to use. In re Est. of Davis, 126 Vt. 19, 22, 220 A.2d 726, 729 (1966). If John and Patricia meant for that clause to operate in the manner defendants suggest, they could have simply said that it applied "in the event [the other parent] survived [the testator] by less than thirty days." But they did not, and we will not "insert terms into an agreement by implication unless the implication arises from the language employed or is indispensable to effectuate the intention of the parties." Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 9, 177 Vt. 70, 857 A.2d 263. Here, the express intention of the parties is accomplished when the survival clause is read to mean precisely what it says.

¶ 33. Moreover, and for similar reasons, we cannot agree with defendants' argument that the contract obliged Patricia to distribute equitably only those assets she acquired from John through testamentary trust but not those she received through joint tenancy. In the survival clause, Patricia stated: "I give, devise and bequeath all of my property, real and personal, and any residuary estate to be divided equally among my children." (Emphasis added). The parties in both wills

15

pronounced their intentions "by this Will to dispose of <u>all my property</u> which I may own at the date of my death." (Emphasis added). Defendants argue that this language does not encompass the jointly titled assets because it does not expressly reference property obtained through the right of survivorship. For support, defendants rely on a selection of cases from other jurisdictions, but these decisions are at best of only limited aid to our analysis. See <u>Ripley</u>, 111 Vt. at 78, 10 A.2d at 206 (explaining that because no two wills are exactly alike, "decisions in the most similar cases are to be considered aids rather than direct authorities"). It is axiomatic that " 'every will is to be construed by itself' " and " 'not with reference to other wills' " because " 'all the light that can be got from other decisions serves only to show in what manner the principles of reasonable construction have . . . been applied in cases more or less similar.' " <u>Shepard's Heirs v. Shepard's Est.</u>, 60 Vt. 109, 116, 14 A. 536, 540 (1888) (quoting <u>Waite v. Littlewood</u>, 4 Moak, Eng. Rep. 760). In other words, in each case, our "principles of construction are only aids in ascertaining, with certainty, the intention of the testator as found in the will itself" and "[w]hen that intention, if lawful, is once ascertained, it is the duty of the court to declare and enforce it." <u>Id</u>.

¶ 34. Here, both wills include identical, express statements of the testator's intention to—equitably among the three children—dispose of all property they owned at the date of their death. The survival clause can—and, therefore, must—be read in a manner that effectuates this intent. <u>Ripley</u>, 111 Vt. at 79, 10 A.2d at 207 (explaining that absent "a clear repugnancy . . . between the different provisions" of a will, we must construe those provisions in manner that "give[s] effect to all"). Defendants' proposed interpretation of the clause clashes with the overarching purpose of equitable, three-way distribution of all of the surviving parent's property that permeates both the survival and trust-termination provisions of both wills. <u>Mattison</u>, 122 Vt. at 488, 177 A.2d at 231 (explaining that because our interpretation must give "[f]orce and effect" to "every part of the will, if possible," we "look to the whole context of the will and consider its general spirit").

16

¶ 35. Although the latter conclusion could end the analysis, we observe that defendants advocate an interpretation of this mutual will's survival clause that would yield counterintuitive real-world consequences. Their reading would mean the parents did not intend to bind one another to do anything with any nontrust assets (such as real property) the surviving parent owned at the date of his or her death—except for in the relatively unlikely event that they died within thirty days of one another. Only in that rare event, defendants argue, would property acquired through the right of survivorship by the surviving parent need to be distributed equally among the children. Setting aside the unlikelihood that parents would seek to accomplish such a worthy and important goal only under such narrow and unlikely circumstances, their interpretation further necessitates the peculiar conclusion that John and Patricia wrote mutual wills intending that the surviving parent might die partially or totally intestate—in other words, with a valid will that did not dispose of all (or any) of his or her estate—despite their express statements of intent to the contrary.[8] See Peck's Est., 101 Vt. at 508, 144 A. at 688 (explaining that where decedent created will, courts will

_____

[8] Although they do not argue that any provision of the mutual wills is ambiguous, defendants also invite us to look to extrinsic evidence to conclude that their proposed interpretation is consistent with their parents' intentions when they executed the wills. But our objective is "to ascertain the intention of the testator[] from the language used" in his or her will, "since, so far as it may be legally carried out, that governs." Mattison, 122 Vt. at 488, 177 A.2d at 231. While that language must be " 'read in the light of the relation of the parties concerned and the circumstances attending its execution,' " only where that initial inquiry leads us to conclude that a will's provisions are ambiguous will we "consider extrinsic evidence in order to clarify the circumstances surrounding the making of the agreement." Holbrook, 2016 VT 13, ¶ 29 (quoting Mattison, 122 Vt. at 488, 177 A.2d at 231). We need not consider whether and to what extent defendants' extrinsic-evidence-based argument concerning the parties' intentions is appropriately raised here because, even it is properly considered, it would not change our conclusion that Patricia breached the contract. Defendants posit that because the court found that John and Patricia jointly titled their assets specifically to avoid probate, this demonstrates their intent that the same property should not be subject to the terms of the will—and, further, that they, in fact, did not intend the wills to have "little or no effect" because they may have held assets that were not jointly titled when they executed these instruments in 1997. But this theory is at loggerheads with an express finding of the trial court that defendants have not challenged: at the time John and Patricia made their mutual wills, "they understood that all of their meaningful assets were jointly titled, and that all of their jointly titled property would pass to the surviving [parent] through the operation of law rather than through the probate court." Thus, even were we to join issue with defendants' argument concerning extrinsic evidence, it would not alter our assessment of John and Patricia's intentions.

presume that decedent did not intend to die intestate, nor to die partially intestate unless that intention can be ascertained "from the express language of the will or from the entire scheme of disposition thereby disclosed"). We reject defendants' interpretation as illogical and inconsistent with the language chosen by John and Patricia throughout the mutual wills.

¶ 36. The plain language of the survival clause is unambiguous standing alone and when considered in the context of the whole instrument. The trust-termination and survival clauses carry out each testator's express intent "by this Will to dispose of all my property which I may own at the date of my death." The former clause governs the disposition of any "remaining residuary assets" held in a testamentary trust created upon the death of the first-deceased parent—of which there turned out to be none—while the latter clause applies to "all" of the surviving parent's "property, real and personal, and any residuary estate." But both specify, in materially identical terms, that upon the death of the surviving parent, the property in question is to be divided equally among their three children. Together, the two clauses ensure this equitable outcome regardless of whether that property was held in trust or acquired by other means, such as the right of survivorship—thus providing for the complete disposition of all property owned by the survivor in perfect keeping with the spirit of fair allocation that flows through the entirety of the instruments. See, e.g., In re Beach's Est., 103 Vt. 70, 77, 151 A. 654, 657 (1930) (observing that "[a] study of the whole will reveals that the outstanding intent of the testator was to keep his entire estate in his own family as long as possible" and construing its provisions in conformance therewith). We discern no tension among the provisions of the will, nor do we see any basis for reading new substantive terms into the survival clause as defendants have effectively proposed. As a result, the survival clause must be enforced as written.

¶ 37. In the alternative, Gregory and Nancy argue that even if the mutual wills govern the disposition of nonprobate assets, Patricia's actual dispensation of those assets did not run afoul of her 1997 will because Article IV of John's will nominated Patricia as his personal representative

18

in the event that she survived him and provided that she could allocate "disproportionate shares of assets among the distributees." Article IV is titled "Personal Representative." It does indeed nominate and appoint Patricia as "Personal Representative of this Will" and, in the event she is or becomes unable or unwilling to so serve, nominates and appoints Gregory as the alternate. It proceeds to give the personal representative:

> all such powers as are conferred upon executors or personal representatives by applicable law, and, in addition thereto . . . the power to distribute my estate in cash and/or in kind, and, to avoid distributing undivided fractional interests when there is more than one distributee, to allocate different assets or disproportionate shares of assets among the distributees and to determine conclusively the value of such assets or shares for distribution purposes.

¶ 38. This language precludes defendants' argument for two reasons. First, it makes clear that the power granted in Article IV was to be exercised by the individual serving as the personal representative, a term used interchangeably with executor. See Representative, Black's Law Dictionary (12th ed. 2024) (defining "personal representative" as "someone who manages the legal affairs of another because of incapacity or death, such as the executor of an estate" and further noting that "an executor is a personal representative named in a will"). Because John's will was never probated, there was no personal representative or executor, and therefore neither Patricia nor Gregory held this power. Second, the plain language of the provision grants the power "to allocate different assets or disproportionate shares of assets among the distributees" only "to avoid distributing undivided fractional interests when there is more than one distributee." Thus, contrary to defendants' position, this provision did not give carte blanche to distribute the assets in whatever manner the personal representative, had one been appointed, so chose—including by disinheriting one of the distributees in contravention of the terms of Article III. Instead, it empowered the personal representative to divide John's estate, according to his wishes, among all of his surviving

19

children without having to distribute undivided fractional interests to arrive at a precisely equal three-way split.[9]

¶ 39.    Finally, defendants contend that even if Patricia's 1997 will required that the assets she owned at the time of her death be divided equally among her three children, she did not breach her agreement with John by transferring some of those assets—specifically, the Greensboro cottage and Tucson home—to Gregory and Nancy <u>before</u> she died.  In advancing this argument, defendants fail to engage head-on with the substance of the trial court's analysis.  The trial court did not hold that these lifetime transfers breached any express provision of the agreement between Patricia and John, as defendants suggest; it found instead that they violated the implied covenant of good faith and fair dealing.

¶ 40.    The implied covenant arises from "[a]n underlying principle implied in every contract . . . that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement."  <u>Carmichael v. Adirondack Bottled Gas Corp. of Vt.</u>, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993).  This "duty of good faith is imposed by law and is not a contractual term that the parties are free to bargain in or out as they see fit."  <u>Id</u>.  Rather, the covenant of good faith and fair dealing is implied in every contract to ensure that the parties "act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' "  <u>Id</u>. at 208, 635 A.2d at 1216 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).

¶ 41.    As a result, a cause of action for breach of the covenant arises only upon a showing that there is an underlying contractual relationship, but breach of an express term of the underlying

---

[9] The same is true of the analogous provision in Patricia's 1997 will.  Had the will remained in force at the time of her death, Gregory would have served as Patricia's alternate personal representative because John predeceased Patricia.  In that role, Gregory would not have had the power "to allocate different assets or disproportionate shares of assets among the distributees" except as necessary "to avoid distributing undivided fractional interests" to himself and his two sisters.

20

contract is not necessary to sustain a claim under the implied covenant. Tanzer v. MyWebGrocer, Inc., 2018 VT 124, ¶ 32, 209 Vt. 244, 203 A.3d 1186. "A breach of the covenant may be shown by evidence that a party to a contract acted in such a way as to 'violate[] community standards of decency, fairness or reasonableness, demonstrate[] an undue lack of diligence, or [take] advantage of [other parties'] necessitous circumstances.' " Id. ¶ 33 (quoting Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 3, 179 Vt. 167, 893 A.2d 298). While case law "inform[s] the substance of this cause of action," the requirements of good faith vary with the context in which it is deemed an implied obligation and the claim thus "feature[s] few precise analytical elements." Carmichael, 161 Vt. at 208-09, 635 A.2d at 1216-17. The existence of a breach is ultimately "a question of fact that depends heavily on the context of the conduct alleged to have breached the covenant." Tanzer, 2018 VT 124, ¶ 34.

¶ 42. Courts have recognized that actions constituting " 'evasion of the spirit of [a] bargain' " may violate the obligation of good faith in performance regardless of whether the actor believes her conduct to be justified. Carmichael, 161 Vt. at 209, 635 A.2d at 1217 (quoting Restatement (Second) of Contracts § 205 cmt. d). For example, in In re Estate of Erickson, an Illinois appellate court explained that a husband and wife, through a joint and mutual will, "created a dispositional scheme by which the survivor of the two would receive all of their property for use during his or her lifetime" and then, upon his or her death, "dispose of their property almost equally among their children." 841 N.E.2d 1104, 1108 (Ill. App. Ct. 2006), appeal denied, 852 N.E.2d 239 (Ill. 2006). Although the will provided that, upon the death of the first spouse, the parties' "entire estates" would become "the survivor's property absolutely," the court rejected the argument that this language "g[a]ve the surviving spouse free reign to disrupt the agreed-upon dispositional scheme." Id. at 1107-08. It concluded that the surviving spouse, by "essentially giving . . . away" the property in the days prior to her death in an effort to circumvent the terms of the will and her contractual obligations, "violate[d] the spirit and purpose of the . . . will, as well

21

as the implied duty to act in good faith—a duty that is part of every contract." Id. at 1108 ("The term 'absolutely' does not give [the surviving spouse] the power to upset the dispositive scheme."). That the property at issue may have passed between the parties to a mutual will by joint tenancy—as is the case here—does not foreclose the conclusion that principles of equity limit the surviving joint tenant's disposition of the property where the mutual will reflects an intent to govern disposition of all of the parties' property. See, e.g., First United Presbyterian Church v. Christenson, 356 N.E.2d 532, 535 (Ill. 1976) (explaining that while title to property held in joint tenancy does not pass to surviving party under mutual will, such property "can be the subject of a contractual agreement contained in [that] will and a court of equity, under appropriate circumstances, will enforce the agreement and limit the surviving joint tenant's disposition of the property").

¶ 43.    Here, the trial court concluded that the two real-estate transactions were contrary to the "agreed common purpose" of the mutual wills, and contrary to the "justified expectation[]" that the surviving spouse would dispose of "all" their property at the time of their death by bequeathing it in equal shares to all three children. Carmichael, 161 Vt. at 208, 635 A.2d at 1216 (quotation omitted).  Defendants make counterarguments based on the express terms of the agreement, but these overlook or misunderstand the trial court's reasoning regarding breach of the implied covenant.  See In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) ("It is the burden of the appellant to demonstrate how the lower court erred warranting reversal.").  We conclude that the trial court applied the correct legal standard, and that defendants have not demonstrated error in its conclusion that Patricia breached her implied-in-law promise not to undermine the disposition of her assets in the manner she agreed with John by diverting the two real properties to them, at Susan's expense, before dying.  See Monahan, 2005 VT 110, ¶¶ 3, 36 (affirming finding that defendant breached implied covenant of good faith and fair dealing where

"jury had ample evidence" to reasonably conclude that defendant did not act with faithfulness to agreed common purpose and justified expectations of other party).

¶ 44.    For these reasons, Gregory and Nancy have not demonstrated that the trial court erred in concluding that they were unjustly enriched as a result of Patricia's breach of express and implied provisions of the mutual-wills contract or that it abused its discretion in awarding Susan equitable remedies in the form of a money judgment and constructive trust.

## B.  Prejudgment Interest

¶ 45.    We therefore turn to the final question on appeal—whether the trial court erred in awarding prejudgment interest on the monetary portion of its award.  Vermont Rule of Civil Procedure 54(a) provides that, "[i]n an action where monetary relief is awarded, the amount of the judgment shall include the principal amount found to be due" and "all interest accrued on that amount up to and including the date of entry of judgment."  We recognize "two kinds of prejudgment interest: 'interest expressly provided for in a contract or note, which is recoverable as an element of the indebtedness sued upon,' and 'interest awarded as damages for detention of money due for breach or default.' " Martin v. Lyon, 2024 VT 68, ¶ 10, 220 Vt. 194, 329 A.3d 184 (alteration omitted) (quoting Reporter's Notes—1981 Amendment, V.R.C.P. 54).

¶ 46.    The latter form of prejudgment interest—the one at issue here—"is awarded as of right when damages are liquidated or reasonably certain" under "[t]he rationale . . . that 'the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages.' " EBWS, LLC v. Britly Corp., 2007 VT 37, ¶ 36, 181 Vt. 513, 928 A.2d 497 (quoting Agency of Nat. Res. v. Glens Falls Ins. Co., 169 Vt. 426, 435, 736 A.2d 768, 774 (1999)).  In cases where the damages amount is uncertain or disputed, an award of prejudgment interest is not mandatory, but "the trial court maintains the ability to award prejudgment interest in a discretionary capacity to avoid injustice." Est. of Fleming v. Nicholson, 168 Vt. 495, 500, 724 A.2d 1026, 1029 (1998).

¶ 47. The trial court concluded that the award of prejudgment interest was mandatory because this was a breach-of-contract case in which the principal sum recovered was liquidated or capable of ready ascertainment. In their motion for reconsideration, defendants argued that they had not been found in breach of any contract, and that damages awarded for an equitable unjust-enrichment claim are not subject to a mandatory award of prejudgment interest. The trial court maintained its conclusion that the award was mandatory, explaining that although "the specific claims against defendants involved unjust enrichment, the amount of damages was determined on the breach-of-contract claim, and the equitable remedies were merely the procedural vehicle used to compensate plaintiff for her mother's breach of contract." It also noted that although there were legal disputes about whether any breach occurred and, if so, which financial accounts and real-estate assets should have been distributed among all three siblings, all of the assets in question had ascertainable values at all times throughout the litigation, meaning that "[a]t any time, the siblings could have tendered one-third of the value of the assets to their sister and continued the litigation over whether any amounts should be paid at all."

¶ 48. The court further concluded that even if prejudgment interest was not mandatory, it would make the same award in its discretionary capacity. It explained that an award compensating Susan for the time-value of money was necessary to avoid the injustice of Gregory and Nancy "benefitting for nearly a decade from the use of the money to which their sister was entitled." The court acknowledged defendants' argument that damages were not readily ascertainable because the parties had disputed whether they would be awarded at all and, if so, which assets would be included in any award. It concluded, however, that the "balance of equities" favored an award of prejudgment interest to make Susan whole.

¶ 49. On appeal, Gregory and Nancy again argue that—notwithstanding the trial court's determination that they unjustly benefited from their mother's breach—it erred in concluding that the award was mandatory because Susan brought her breach-of-contract claim only against her

24

mother's estate and not against them. Defendants also contend that it was an abuse of discretion to award prejudgment interest under the circumstances. Because we see no abuse of discretion, we do not decide whether the award of prejudgment interest was mandatory under the circumstances.[10] See Alberino v. Balch, 2008 VT 130, ¶ 7, 185 Vt. 589, 969 A.2d 61 ("We will not reverse the trial court's decision if the record below reveals any legal grounds that would justify the result.").

¶ 50. Although prejudgment interest "is not the unqualified right of the prevailing litigant" in cases "not involving contractual obligations," the trial court "is invested with broad discretion to allow interest in accordance with principles of equity." Legault, 142 Vt. at 532, 459 A.2d at 984-85 (quotation and alteration omitted). "[W]hen interest is allowed, at what rate and from what date is wholly within the discretion of the court," and we will not reverse its decision absent an abuse of that discretion. Id. at 532, 459 A.2d at 985; Fleming, 168 Vt. at 503, 724 A.2d at 1032. In arguing abuse of discretion, Gregory and Nancy point to the lengthy history of litigation between the parties, contending that at no point did the decisions of the trial court or this Court give them grounds to know that Susan would obtain a judgment against them and what assets might comprise any judgment for her.

¶ 51. We first note that the record supports the trial court's conclusions that defendants had ample basis to know the amount of money at issue and to anticipate that Susan could receive an award in that amount. Although we affirmed the allowance of Patricia's 2006 will in McHugo I, we also observed that Susan was not without "a potential remedy" because her arguments based

---

[10] We recently held in Hirchak v. Hirchak that "awards of prejudgment interest on an unjust-enrichment claim are discretionary." 2024 VT 81, ¶ 38. But in Hirchak, there was no valid underlying contract, and the court-ordered reimbursement was thus based solely "in equitable principles of unjust enrichment"—whereas here, the trial court reasoned that the unjust-enrichment claims were effectively the procedural vehicles through which Susan recovered from defendants as the beneficiaries of Patricia's breach of contract. Id. ¶ 37. Because we do not reach defendants' challenge to this reasoning, we do not consider whether the principle announced in Hirchak would apply with equal force here.

on the mutual-wills contract reflected a claim against Patricia's estate. 2020 VT 59, ¶ 13. Moreover, defendants received the money in Patricia's accounts following her death, and they knew that their sister took the position that these funds should have passed in equal measure to her. See Mueller, 2012 VT 59, ¶ 29 (recognizing that third party may be unjustly enriched by receiving property in violation of a contract to make a specific devise). They also knew that, in McHugo II, we reversed the trial court's initial judgment in a manner favorable to Susan.[11] 2024 VT 75, ¶ 1. In any event, the trial court—intimately familiar with the lengthy history of this case and after acknowledging the parties' sincere dispute about the availability of damages—nonetheless concluded that equity demanded an award of prejudgment interest. And while knowledge of the amount owed is "a relevant factor" in the equitable inquiry, it is not an absolute "requirement for a discretionary award of prejudgment interest." Fleming, 168 Vt. at 503, 724 A.2d at 1031 (rejecting argument that court abused its discretion in awarding prejudgment interest where damages were not reasonably ascertainable).

¶ 52. Defendants argue that Epsom v. Crandall stands for the proposition that a discretionary award of prejudgment interest is unwarranted where there was conflicting evidence on the amount of damages. 2019 VT 74, 211 Vt. 94, 220 A.3d 1247. But this is an overbroad reading of Epsom. There, we held that a trial court did not abuse its discretion by declining to award prejudgment interest on a jury's judgment against the defendants for timber trespass because the value of the cut trees was not readily ascertainable. Id. ¶ 41. The fact that other trial courts, including the one in Epsom, have balanced the equities differently on different facts does not

---

[11] Although defendants appear to suggest that it was a per se abuse of discretion to award prejudgment interest during the time when the judgment in their favor was pending appeal, they have not identified any legal authority in support of this proposition. See V.R.A.P. 28(a)(4)(A) (requiring that appellant's brief include "appellant's contentions and the reasons for them—with citations to the authorities . . . on which the appellant relies"). To the extent defendants intended to raise this argument, we decline to address it as inadequately briefed. In re Snyder Grp., Inc., 2020 VT 15, ¶ 26 n.10, 212 Vt. 168, 233 A.3d 1077.

demonstrate an abuse of discretion in this case. See, e.g., Fleming, 168 Vt. at 501, 724 A.2d at 1030 (explaining that although trial court in Winey v. William E. Dailey, Inc., 161 Vt. 129, 141, 636 A.2d 744, 752 (1993), "determined that the balance of equities did not mandate an award of prejudgment interest on certain items, in the instant case, the court concluded that they did" and explaining that "[t]his was within the proper scope of the court's discretion").

¶ 53.     To show that the trial court abused its discretion in awarding prejudgment interest, Gregory and Nancy must demonstrate that the trial court either "entirely withheld its discretion" or, in the alternative, exercised its discretion "for clearly untenable reasons or to a clearly untenable extent." Hirchak, 2024 VT 81, ¶ 39 (quotation omitted). They have not done so. The trial court weighed all of the relevant factors and concluded that prejudgment interest was necessary to avoid injustice to Susan. That conclusion fell comfortably within the scope of its considerable discretion.

Affirmed.

FOR THE COURT:

_____
Associate Justice

27